# IN THE SUPREME COURT OF IOWA

No. 20–0582

Submitted July, 27, 2020—Filed September 4, 2020

**IN THE INTEREST OF Z.P.,**

Minor Child,

**F.M., Father,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Rachael E. Seymour, Judge.

A father seeks further review of a court of appeals decision affirming the termination of his parental rights to a child. **AFFIRMED.**

Per curiam.

Jesse A. Macro of Macro and Kozlowski, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Toby J. Gordon, Assistant Attorney General, John P. Sarcone, County Attorney, and Eva T. Morales, Assistant County Attorney, for appellee.

Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

**PER CURIAM.**

Concerned that a parent might have been unfairly penalized for working too hard, we took further review of this termination-of-parental-rights case. On closer examination of the entire record, we find that clear and convincing evidence supports the order entered below.

A small child was removed from her mother's custody after the child's mother was found to have repeatedly beaten the child's older half-sibling. The child was adjudicated in need of assistance. For nearly eighteen months, the father—who had never lived with the child—received services. He made some progress, although he never got past one or two semisupervised visits per week with the child at a public library. One limiting factor was the father's grueling work schedule: he worked two full-time jobs weekdays from 6 a.m. to midnight. But that was not the only consideration. The father also lacked a driver's license and the ability to obtain one. The father's plans for child care were vague. Most importantly, the father did not develop the parenting skills needed for age-appropriate interactions with the child and did not appear to appreciate the child's psychological needs. He was not ready to take full-time custody of the child. After almost eighteen months in limbo, the child was entitled to permanency. Accordingly, we affirm the order of the juvenile court and the decision of the court of appeals terminating parental rights.

## I. Facts and Procedural History.

Z.P. was born November 2016 to mother H.P. and father F.M. For nearly two years, Z.P. lived with H.P. and two older half-siblings. F.M. visited Z.P. periodically. In September 2018, the three children came to the attention of the Department of Human Services (DHS). The oldest child had suffered repeated physical abuse at the hands of H.P. Photographs graphically documented the abuse. The three children were removed and

placed in foster care. They have remained out of parental custody since that time.

In November 2018, the three children were adjudicated children in need of assistance (CINA). In January 2019, a dispositional hearing was held. The children were confirmed CINA, and their prior placement was confirmed. The juvenile court also found that reasonable efforts were being made to eliminate or prevent the need for removal of the children from the home.

In March 2019, the children had to move to shelter care for a while. The following month, Z.P. and her older half-sister were placed in a new foster home, and the older half-brother (the one who was the prior victim of physical abuse at the hands of H.P.) entered a different foster home.

In June, a review hearing was held. The children's status as CINA was confirmed, as was their placement outside the home. The juvenile court again determined that reasonable efforts were being made toward reunification. In September, a permanency hearing took place. The parents were granted a three-month extension until December, but with a directive that a termination petition should be filed if reunification could not occur by then.

In December, the State filed a petition to terminate parental rights as to all three children. The case proceeded to a hearing in late January 2020. Testimony was taken from five witnesses—H.P., F.M., H.P.'s therapist, a service provider, and a DHS caseworker. The DHS caseworker and the guardian ad litem recommended termination. In March 2020, the juvenile court entered an order terminating parental rights.

F.M., as noted, is Z.P.'s father.[1]   At the time of the termination hearing, F.M. was sixty years old and H.P. was forty-two.  Z.P. has never lived with F.M.

F.M. works two jobs during the week.  His first job shift starts at 6 a.m. and ends at 2:30 p.m.  His second starts at 3:30 p.m. and runs until midnight.  F.M. explained at the termination hearing that if he were granted custody of Z.P., he would quit the second job.  Previously, though, he told DHS repeatedly that he needed to work both jobs to meet his financial needs.

DHS attempted to schedule visitation in the early to midafternoon during the shoulder period between F.M.'s jobs to minimize the time that F.M. would miss from work.  Nonetheless, there were times F.M. could not attend.

DHS provided documentation to assist F.M. in getting time off from work.  However, by the time of the termination hearing, both employers were indicating they could no longer give F.M. time away work for parenting reasons.

F.M. has not raised a child before.  During the course of the case, he successfully completed two parenting classes and progressed to semisupervised visitation.  However, DHS noted that aspects of F.M.'s interactions with Z.P. were not age-appropriate.  F.M. would repeatedly feed Z.P. (although she was capable of feeding herself) and talk baby talk to her (although she was quite verbal).  The foster mother reported that after visits with F.M., Z.P. acted more "baby-like" than prior to the visits. Z.P. was, however, excited to see F.M. and recognized him as her father.

---

[1]The fathers of the two older half-siblings could not be identified.

Z.P. was seeing a therapist because of the disruptions she had undergone in her relatively brief life. She was reported to have screaming episodes. F.M. had not been involved in Z.P.'s medical or psychological care and did not know why she was in therapy.

F.M. has a car and drives himself around, but he does not have a driver's license or the ability to get a driver's license. F.M. drove Z.P. in his car a couple of times during visits until DHS told him he could not do so. F.M. testified at the hearing that a coworker-friend would be able to pick up Z.P. and deliver her to an in-home day care.[2]

F.M. lives in a one-bedroom apartment. The apartment has one bed, suitable for an adult. F.M. explained at the hearing that if he were granted custody of Z.P., he would install a guardrail to make the bed suitable for a toddler, and he would sleep on the couch.

There was disputed evidence regarding F.M.'s drinking. H.P. claimed that F.M. had a drinking problem; F.M. denied this. A social worker reported that at an August 2019 team meeting, F.M. was hung over and smelled of alcohol.

The juvenile court terminated H.P.'s parental rights to the two older half-siblings under Iowa Code section 232.116(1)(*f*) (2019)—child over the age of four, previously adjudicated CINA, removed from physical custody for at least twelve of the last eighteen months, cannot be returned to the parents at the present time. The juvenile court terminated both H.P.'s and F.M.'s parental rights to Z.P. under section 232.116(1)(*h*)—child three years of age or younger, previously adjudicated CINA, removed from physical custody for at least six of the last twelve months, cannot be returned to the parents at the present time. F.M. appealed.[3]

---

[2]F.M. did not know if this coworker had a valid driver's license.

[3]H.P. did not appeal.

On appeal, F.M. has raised two arguments. First, he maintains that Z.P. was never "formally removed" from him. She had been living only with H.P., her mother, when the removal order was entered. Second, F.M. urges that the State failed to show that Z.P. could not be placed with him at the time of the termination hearing. As F.M. put it, "No witness could articulate that father posed a danger to his child or that he did not have adequate skills to parent his child safely and on a full-time basis."

The court of appeals rejected both arguments and affirmed termination. In overruling F.M.'s second point, the court observed in part,

> The barriers preventing the father from taking over care of Z.P. are unique in comparison to other termination-of-parental-rights cases we see, but that does not make them any less real. The father works approximately eighteen hours per day, Monday through Friday. While he testified he would quit his evening job if Z.P. was placed in his care, he was still actively working both jobs at the time of the termination hearing in late January 2020. Based on previous statements made by the father, it is not clear he could financially afford to quit working the second job.

Seizing on this language, F.M. has sought further review. As F.M. puts it,

> Concluding working 18 hours [a] day to provide for your family is the same as beating a child, starving a child, sexually abusing a child, using methamphetamine when caring for a child, failing to provide proper medical care and treatment for a child or abandoning a child is not only an abuse of discretion by the Iowa Court of Appeal[s] but an offensive public policy . . . .

We granted F.M.'s application.

## II.  Standard of Review.

"We review proceedings terminating parental rights de novo." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re D.W.*, 791 N.W.2d 703, 706

(Iowa 2010)). "There must be clear and convincing evidence of the grounds for termination of parental rights." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016); *see also* Iowa Code § 232.117.

### III. Legal Analysis.

To terminate F.M.'s parental rights to Z.P. under Iowa Code section 232.116(1)(*h*), the State must prove the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

F.M. challenges only the third and fourth elements.

**A. Removed from Parents' Physical Custody.** F.M. argues that the State failed to prove the child had been removed from the physical custody of the child's parents. *See id.* § 232.116(1)(*h*)(3). In support of this contention, F.M. points out he never had physical custody of Z.P.; therefore, Z.P. could not have been "removed" from his custody. *See id.* However, this statutory element was not disputed below and is therefore not preserved for appeal. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) ("[T]he general rule that appellate arguments must first be raised in the trial court applies to CINA and termination of parental rights cases."). In any event, in the fall of 2018, the juvenile court ordered that Z.P. be removed from the mother and placed in the custody of DHS. This constituted a physical removal as contemplated by the statute. "Physical removal from the mother is sufficient to start the statutory timelines counting toward termination as to either parent." *In re J.E.*, 907 N.W.2d 544, 547 (Iowa Ct. App. 2017); *see also* Iowa Code § 4.1(17) ("Unless

otherwise specifically provided by law the singular includes the plural, and the plural includes the singular.").

**B. Cannot Be Returned to the Parent's Custody.** Next, F.M. insists that the State failed to prove Z.P. could not be placed in his custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(*h*)(4). In his application for further review, F.M. maintains it is "offensive" to equate him with someone who actively endangers his children by beating them, sexually abusing them, misusing drugs, or denying food or medical care. F.M. made the same point more delicately in his hearing testimony: "Could you tell me what are my mistakes exactly?"

But juvenile law is not a fault-based edifice like tort law. Our statutes reflect "policies that are meant to keep children from languishing in foster care." *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially). "While we recognize the law requires a 'full measure of patience with troubled parents who attempt to remedy a lack of parenting skills,' Iowa has built this patience into the statutory scheme of Iowa Code chapter 232." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (en banc).

> [T]he legislature incorporated a twelve-month limitation for children in need of assistance aged four and up, and a six-month limitation for children in need of assistance aged three and below. . . . Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency.

*Id.* at 494–95. "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *In re D.W.*, 791 N.W.2d at 707. "The 'legislature has established a limited time frame for parents to demonstrate their ability to be parents.' The time frame is six months." *In re A.S.*, 906 N.W.2d 467,

474 (Iowa 2018) (citation omitted) (quoting *In re J.E.*, 723 N.W.2d at 800 (majority opinion)).

These deadlines stem in large part from mandates in federal law. In 1997, "federal law shifted the focus from family reunification to 'time-limited family reunification services.'" *In re C.M.*, 652 N.W.2d 204, 208 (quoting 42 U.S.C. § 629a(a)(7) (1994 & Supp. III 1997)); *see also In re C.B.*, 611 N.W.2d at 493. As the concurring opinion in *J.E.* observed,

> Before 1997, child welfare laws—including Iowa's—focused on reuniting the family unit. Subsequently, and after Congress's enactment of the Adoptions and Safe Families Act of 1997 (ASFA), national and state child welfare laws emphasized the importance of timely providing children with appropriate custodial care.

*In re J.E.*, 723 N.W.2d at 801 (citations omitted) (Cady, J., concurring specially).

At the time of the termination ruling, Z.P. had spent the last year and a half in a combination of foster and shelter care. Unquestionably, F.M. loved Z.P., wanted to be a father to her, and had made some progress. But it would not be fair to say the child could be placed with him. Although some language in the court of appeals' opinion, taken in isolation, might suggest that F.M. was penalized simply for not quitting his second job until he garnered custody of Z.P., the record shows a number of reasons why F.M. was not prepared to assume a parenting role at the time of trial.

From what we can tell, F.M. had never taken care of Z.P. overnight. His interactions during visitation were fairly limited and not age-appropriate: feeding snacks to Z.P., and holding Z.P. on his lap and talking baby talk to her. Because F.M. had no driver's license, his parenting plan would have involved having a coworker pick up Z.P. and deliver Z.P. to an in-home daycare very early in the morning, and then pick up Z.P. and deliver Z.P. back to his house at the end of the day.

F.M. did not have a sleeping arrangement suitable for a toddler. F.M. did not have a plan for getting Z.P. to therapy or medical appointments. F.M. also lacked knowledge of Z.P.'s medical and psychological needs. F.M. had no personal support network and would have had to take time off from work if Z.P. were ill. Meanwhile, his employers had been refusing to allow him time off for visitation. Although we do not fault F.M. for continuing to work 6 a.m. to midnight as long as he did not have custody of Z.P., the record indicates that F.M. told DHS he would continue to work that schedule even if he got custody of Z.P.; he only changed his story at the termination hearing. F.M. vehemently expressed his desire to have custody and care for Z.P. But he lacked the necessary plan of action to support his aims.

Indeed, the court of appeals opinion went on to note several of these points:

> As of the termination hearing, the father did not have a plan in place for who would care for Z.P. while he was working. He stated he was aware of a place that took children before 6:00 a.m.—the time he would need to drop Z.P. off—but he had not checked the place out or filled out an application for Z.P. to attend. We question if the father would schedule and get Z.P. to her therapy and other necessary appointments—because of his long work hours, his apparent lack of interest in and knowledge about Z.P.'s medical and mental-health issues, and his lack of a driver's license. Additionally, the father's home was not ready for Z.P. to live in, as he did not have a bed in which it was safe for her to sleep.

In some respects, this case is like *In re A.M.*, 843 N.W.2d 100. The parents there were well intentioned; they displayed none of the characteristic red flags found in so many of these termination cases. *See id.* at 109. We thus acknowledged that *A.M.* was a "difficult case" because "it does not present any of the usual precursors to termination of parental rights, such as physical or emotional abuse of the child, substance abuse

by one or both parents, domestic abuse, parental criminal conduct, or even overt neglect." *Id.* at 111. Nonetheless, the parents there had not made the necessary progress to serve as a safe home for the young child. *Id.* at 111–12. Citing the statutory timeframes, we added,

> A.M. had been away from her parents for over a year, virtually since she was born. If a child cannot be returned to the parents at that point, termination should occur so long as it is in the best interests of the child and the juvenile court does not find an exception to termination that warrants a different result.

*Id.* at 111; *see also In re A.S.*, 906 N.W.2d at 473 (upholding termination of a mother's parental rights where the mother "willingly participated in the services offered and has progressed, but she has not progressed to the point where she can care for the child without ongoing assistance").

Accordingly, like the court of appeals and the juvenile court, we find clear and convincing evidence that F.M. was not in a position to take custody of Z.P. at the time of trial.

**C. Best Interests of the Child**. We next turn to whether the best-interests framework in Iowa Code section 232.116(2) supports termination. *See* Iowa Code § 232.116(2); *In re A.B.,* 815 N.W.2d at 776 ("Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best interests."); *In re P.L.,* 778 N.W.2d 33, 40–41 (Iowa 2010) (discussing the best interests of the child test). In this regard, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

Z.P. is three years old. She has bounced from a relative to a foster home to a shelter to another foster home since being removed from her mother's custody in early October 2018. She is doing well in the current

foster home, which is a preadoptive placement. She is more bonded to her foster family than to F.M., whom she was meeting at most two afternoons a week at the library. It is time for her to have permanency. We find that termination is in Z.P.'s best interests.

F.M. does not claim that any of the exceptions to termination in Iowa Code section 232.116(3) apply here.

For the foregoing reasons, we affirm the decision of the court of appeals and the order of the juvenile court terminating F.M.'s parental rights to Z.P.

**AFFIRMED**.

This opinion shall be published.